******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

WESTERN DERMATOLOGY CONSULTANTS, P.C. *v.*
VITALWORKS, INC., ET AL.
(SC 19248)

Palmer, Zarella, Eveleigh, McDonald and Vertefeuille, Js.

*Argued September 10, 2015—officially released August 16, 2016*

*Linda L. Morkan*, with whom, on the brief, were *Phyllis S. Lynn*, pro hac vice, and *Bradford S. Babbitt*, for the appellant (plaintiff).

*Kimberly A. Knox*, with whom were *Dana M. Hrelic* and, on the brief, *Wesley W. Horton* and *Edward T. Krumeich*, for the appellee (named defendant).

*Steven R. Smart*, for the appellee (defendant Cerner Physician Associates, Inc.).

*Opinion*

PALMER, J. In this certified appeal, the plaintiff, Western Dermatology Consultants, P.C., claims that the Appellate Court improperly reversed the judgment of the trial court, which found that the defendants, VitalWorks, Inc. (VitalWorks),[1] and Cerner Physician Associates, Inc. (Cerner), had violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.,[2] by making misrepresentations in connection with the sale of certain practice management and electronic medical records software to the plaintiff. The plaintiff contends that the Appellate Court incorrectly concluded that, under applicable choice of law principles, the law of New Mexico, rather than CUTPA, governs the plaintiff's unfair trade practices claim. We conclude that the Appellate Court correctly determined that that claim is governed by New Mexico law. Contrary to the determination of the Appellate Court, however, we conclude that the case must be remanded for a new trial so that New Mexico law can be applied to the plaintiff's unfair trade practices claim.[3]

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal. The plaintiff is a dermatological clinic with two offices located in Albuquerque, New Mexico. Vital-Works is a Delaware corporation that, at all times relevant to this appeal, had its corporate headquarters in Ridgefield, Connecticut, and was engaged in the marketing and selling of software designed to assist physicians in efficiently managing patient appointments, billing, and medical records. VitalWorks' software development and technical support facility is located in Alabama. Cerner is a Delaware corporation with its principal place of business in Missouri. In January, 2005, Cerner purchased VitalWorks' Alabama operations and continued to market, service, and develop the software thereafter.

In March, 2003, the plaintiff's representative attended a medical conference in San Francisco, California, where VitalWorks was demonstrating its software. At the time, the plaintiff did not contemplate the purchase of new software because it was satisfied with older software that it had been using in its practice since 1997. At the conference, however, Tim Holman, a VitalWorks' salesperson, and Terri Cannady, a representative from the company that marketed the older software, informed the plaintiff's representative that the plaintiff would need to replace the older software because it was going to be phased out and would no longer be supported. As a replacement for the older software, the plaintiff was offered VitalWorks' software. Holman told the plaintiff that VitalWorks' software was "user-friendly" and would increase the plaintiff's efficiency and save it money by streamlining the preparation of medical notes and billing statements. Specifically, Hol-

man represented that the new software would allow the plaintiff's receptionist to confirm a patient's information upon the patient's arrival and create a note that, with "[a] click [of] a button," would be sent to the physician, who would fill it out while examining the patient, thereby creating a billing statement with the required diagnostic codes and necessary prescriptions.

In September, 2003, Holman traveled to one of the plaintiff's Albuquerque offices to conduct a follow-up demonstration. Following that demonstration, Holman sent the plaintiff a letter stating that, on the basis of the plaintiff's then existing monthly transcription expense of $2500,[4] the plaintiff would realize "a return on investment in two years" were it to purchase the new software. Holman also informed the plaintiff that, by purchasing the new software prior to the end of 2003, it would avoid a 15 percent price increase.

Having been told that the older software no longer would be supported and that a price increase for the new software was imminent, the plaintiff agreed to purchase the new software for $44,170.30, which included software training by VitalWorks employees. On December 19, 2003, the plaintiff signed a standard form contract produced by VitalWorks' Connecticut headquarters. The choice of law provision of the contract provided that "[the] [a]greement shall be construed and interpreted in accordance with the laws of the [s]tate of Connecticut and any dispute shall be resolved in a forum located in the [s]tate of Connecticut."

As soon as the new software was installed, the plaintiff began experiencing technical difficulties while attempting to use it. Contrary to the representations made by Holman, the plaintiff's physicians and staff found the software neither fast nor user-friendly. The plaintiff experienced a wide variety of problems with the software, including (1) loss of access to the system while attempting to schedule appointments, (2) the need to change passwords on multiple occasions, (3) claims not closing when payments were posted, thereby requiring the plaintiff to manually enter secondary billing statements, (4) uninitiated user log offs, (5) disappearing toolbar buttons, (6) inaccurate patient ledgers, and (7) blank screens that required a complete reboot of the system. In addition to these fundamental software flaws, the physicians were not able to use the system while seeing patients because the software did not have preinstalled dermatological terminology and did not allow users to indicate the number and size of lesions and biopsies, the name or dosage of prescribed medication, or whether the patient had been informed about the potential risks and benefits of medication. As a result of these defects, creating medical notes with the new software took far longer than it did to create those notes manually.

When the plaintiff complained to VitalWorks about

the new software's poor performance, VitalWorks denied that the problems were software related and recommended additional training for the plaintiff's employees. Despite that training, however, the plaintiff's problems persisted because, in fact, they were primarily software related. Indeed, the plaintiff never was able to bill a patient, generate a prescription or complete a real time checkout using the software, and, as a consequence, the plaintiff ultimately abandoned it in May, 2005. The plaintiff commenced the present action against the defendants in August, 2006.

In its second amended complaint, the plaintiff alleged six counts: (1) breach of contract; (2) breach of warranty; (3) fraud; (4) negligent misrepresentation; (5) unjust enrichment; and (6) a violation of CUTPA.[5] Following a bench trial, the court concluded that the plaintiff had proven its case against VitalWorks on the breach of contract, breach of warranty, negligent misrepresentation, and CUTPA counts.[6] The court also found in favor of the plaintiff on its CUTPA claim against Cerner, concluding that Cerner was liable under CUTPA pursuant to the continuity of enterprise exception to the successor in interest doctrine. The court further concluded that, following the acquisition of VitalWorks' Alabama operations, Cerner itself had violated CUTPA by engaging in unfair trade practices while being involved in trade or commerce that was intimately associated with Connecticut.[7] Thereafter, the defendants filed motions to reargue and for articulation, and the plaintiff filed motions for costs, attorney's fees, prejudgment interest, and punitive damages.[8]

In its motion to reargue, VitalWorks asserted, among other things, that the trial court improperly had failed to subject the plaintiff's unfair trade practices claim to a choice of law analysis and, instead, appeared to have "automatically" assumed that Connecticut law applied to that claim. VitalWorks further argued that, under a choice of law analysis, it was clear that New Mexico rather than Connecticut law should govern the plaintiff's claim because New Mexico had the most significant contacts with the occurrence and the parties. In its memorandum of decision on VitalWorks' motion to reargue, the trial court noted that it had applied Connecticut choice of law principles to the facts and determined that Connecticut was the state that had the most significant relationship to the occurrence and the parties involved. The trial court explained that, in evaluating the choice of law issue, it had utilized the principles set forth in §§ 6 (2) and 145 (1) of the Restatement (Second) of Conflict of Laws. See 1 Restatement (Second), Conflict of Laws § 6 (2), p. 10 (1971); 1 id., § 145 (1), p. 414. In a subsequent memorandum of decision on VitalWorks' motion for articulation, the trial court further explained that "the strongest and most predictable contact" in the present case was Connecticut because "Ridgefield, Connecticut was the corporate

headquarters for VitalWorks. Corporate responsibility for product development, marketing, sale and delivery of a functioning product is most strongly connected to Connecticut. The sales agreement was drafted in Connecticut by VitalWorks. . . . Among the terms [of that agreement] . . . was a standardize[d] choice of law/forum provision [that] required that Connecticut law apply to contract interpretation and required [Connecticut] to be the locus of dispute resolution."

In addition to its choice of law argument, VitalWorks contended that, even if Connecticut law did apply to the plaintiff's unfair trade practices claim, VitalWorks' conduct, as alleged by the plaintiff, did not fall within the purview of CUTPA because VitalWorks had not engaged in any trade or commerce in Connecticut. The trial court rejected this argument, noting that the facts that it found supported the conclusion that the actions that gave rise to the plaintiff's claims "occurred in Connecticut or were the result of [VitalWorks'] corporate [decision] to market and sell software systems [that] it knew had not been fully developed and [that] would not operate as represented to [the plaintiff]." Specifically, the trial court explained that "[t]he contract in question qualified as trade or commerce within the state of Connecticut . . . . It [was] the genesis of the relationship between [the] plaintiff and VitalWorks . . . ." (Internal quotation marks omitted.)

On appeal to the Appellate Court, VitalWorks and Cerner both claimed, inter alia, that the trial court incorrectly had determined that Connecticut law governed the plaintiff's unfair trade practices claim. See *Western Dermatology Consultants*, *P.C.* v. *VitalWorks*, *Inc.*, 146 Conn. App. 169, 197, 78 A.3d 167 (2013). The defendants further argued that, even if Connecticut law applies to that claim, the trial court incorrectly concluded that the plaintiff had satisfied the requirements of CUTPA. Id., 198. The Appellate Court agreed with both contentions. See id., 201, 211.

The Appellate Court first concluded that, by its express terms, CUTPA applies only to acts of trade or commerce conducted in Connecticut. Id., 200. The court further concluded that the practices that the plaintiff complained of actually had occurred outside of Connecticut. See id., 200–201. Specifically, the court referred to the evidence demonstrating that the plaintiff was located in New Mexico, and the first and second product demonstrations by VitalWorks took place in California and New Mexico, respectively. Id., 200. The court also observed that (1) the software and hardware purchased under the contract were installed in New Mexico, and the concomitant services were also performed in that state; id., 200–201; (2) the VitalWorks employees with whom the plaintiff dealt were located in Alabama, and those employees remotely installed the new software in New Mexico; id., 201; and (3) all of

the development work on the new software from 2001 forward had been performed in Alabama. Id. On the basis of this evidence, the court concluded that the plaintiff had no cause of action under CUTPA because no "trade" or "commerce" within the meaning of CUTPA had occurred in Connecticut. (Internal quotation marks omitted.) Id.

Next, the Appellate Court engaged in a choice of law analysis in accordance with the most significant relationship test set forth in §§ 6 (2) and 145 of the Restatement (Second) of Conflict of Laws; see, e.g., *Jaiguay* v. *Vasquez*, 287 Conn. 323, 349–50, 948 A.2d 955 (2008) (adopting most significant relationship test of Restatement [Second] of Conflict of Laws for tort actions); and concluded that the trial court incorrectly had determined that the plaintiff's unfair trade practices claim was governed by Connecticut law.[9] See *Western Dermatology Consultants*, *P.C.* v. *Vitalworks*, *Inc.*, supra, 146 Conn. App. 211. In particular, the Appellate Court concluded that the application of the factors outlined in § 145 (2) of the Restatement (Second) militated in favor of applying New Mexico law because that state had the "greatest contact" with the parties. Id., 207–208. Specifically, New Mexico was the center of the relationship, it was where the plaintiff was injured, and it was where the contracted for goods were installed and serviced. Id., 207. Similarly, the Appellate Court concluded that consideration of the factors outlined in § 6 (2) of the Restatement (Second) also supported the applicability of New Mexico law.[10] Id., 208–11. Accordingly, the Appellate Court reversed the judgment of the trial court and directed that court to render judgment for the defendants on the CUTPA count.[11] Id., 214.

We granted the plaintiff's petition for certification to appeal, limited to the following issues: "1. Under the established [conflict of law] principles . . . and the facts of this case, did the Appellate Court properly determine that [CUTPA] applies to this case?" *Western Dermatology Consultants*, *P.C.* v. *VitalWorks*, *Inc.*, 310 Conn. 955, 81 A.3d 1182 (2013). "2. If the answer to the first question is in the affirmative, did the Appellate Court properly determine that the plaintiff failed to satisfy the requirements of CUTPA because, under the facts of this case, no trade or commerce occurred in the state of Connecticut?" Id. "3. If the answer is in the negative, did the trial court correctly determine not to award prejudgment interest, punitive damages and certain requested litigation costs?" Id. Upon review of the record, however, and after due consideration of the claims that the parties raised in their briefs and at oral argument, we conclude that the first and second certified questions do not accurately reflect the issues raised by this appeal. Therefore, we consider it necessary to reformulate those questions so that they reflect the actual issues presented. See, e.g., *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 276 Conn. 168, 191,

884 A.2d 981 (2005) (court may "reformulate . . . the certified question to reflect . . . accurately the issues presented"). Accordingly, we set forth the following revised certified questions: 1. Under established choice of law principles, did the Appellate Court properly determine that CUTPA does not apply to the plaintiff's unfair trade practices claim? 2. If the answer to the first question is in the negative, did the Appellate Court properly determine that the plaintiff failed to satisfy the requirements of CUTPA because, under the facts of this case, no trade or commerce occurred in the state of Connecticut? 3. If the answer to the second question is in the negative, did the trial court properly decline to award prejudgment interest, punitive damages and certain requested litigation costs?

On appeal, the plaintiff argues that the Appellate Court incorrectly determined that the law of New Mexico should govern the plaintiff's unfair trade practices claim because (1) the defendants waived their right to argue that New Mexico law should apply to that claim by failing to allege and establish in the trial court that there exists an outcome determinative conflict between the laws of Connecticut and New Mexico, and (2) under the test set forth in §§ 6 (2) and 145 of the Restatement (Second) of Conflict of Laws, Connecticut law governs its unfair trade practices claim. The defendants dispute the plaintiff's contention and argue, in addition, that, in light of the Appellate Court's disposition of the case against the plaintiff on all counts, there are no remaining facts to support the plaintiff's CUTPA claim, and, consequently, the appeal is moot. We conclude that the plaintiff's appeal is not moot and that the Appellate Court correctly determined that New Mexico law governs the plaintiff's unfair trade practices claim. We therefore remand the case for a new trial at which the plaintiff's unfair trade practices claim shall be decided under New Mexico law.[12]

We first address the defendants' contention that this appeal is moot. See, e.g., *In re Jorden R.*, 293 Conn. 539, 555, 979 A.2d 469 (2009) ("[m]ootness is a question of justiciability that must be determined as a threshold matter because it implicates [a] court's subject matter jurisdiction" [internal quotation marks omitted]). As we previously indicated, the defendants argue that the appeal is moot because the Appellate Court's reversal of the trial court's judgment on the breach of contract, breach of warranty and negligent misrepresentation counts eliminated all of the possible factual bases for the alleged CUTPA violation. In addition, Cerner separately argues that there is no factual basis to support the plaintiff's CUTPA claim against it because the trial court found in favor of the defendants on the plaintiff's unjust enrichment claim, and because the plaintiff alleged in its complaint that Cerner violated CUTPA only on the basis of the allegations in the unjust enrichment count. We disagree with both contentions.

With respect to the first contention, the record reveals that the Appellate Court reversed the trial court's judgment on the plaintiff's breach of contract claim not because the trial court's factual findings relating to that claim were unsupported but, rather, because the plaintiff failed to comply with the notice requirements in the parties' contract and the Uniform Commercial Code for bringing such a claim. See *Western Dermatology Consultants, P.C.* v. *VitalWorks, Inc.*, supra, 146 Conn. App. 182–83. Similarly, the Appellate Court reversed the trial court's judgment on the breach of warranty and negligent misrepresentation claims not because the trial court's factual findings relating to those claims were unsupported but, rather, because the trial court improperly had determined that the merger clause of the parties' contract did not limit the plaintiff to the warranties expressly provided thereunder.[13] Id., 191, 197. We also reject Cerner's separate contention because the record shows that the unjust enrichment count was not the only count that provided a factual basis for the unfair trade practices count. Specifically, in its CUTPA count, the plaintiff alleged that the defendants' conduct, "including but not limited to their misrepresentations, their sale of nonfunctioning products, their refusal to comply with their obligations under the contract, their refusal to return [money] paid by the plaintiff for which the plaintiff received nothing of value, and their attempt to contract through false pretenses . . . constitute[s] unfair and deceptive trade practices . . . ." Thus, it is clear that the plaintiff did not predicate its CUTPA count against Cerner solely on the allegations contained in the unjust enrichment count. Accordingly, we conclude that this appeal is not moot.

We turn, therefore, to the merits of the plaintiff's contention that the Appellate Court incorrectly determined that, contrary to the conclusion of the trial court, the law of New Mexico, rather than the law of Connecticut, governs the plaintiff's unfair trade practices claim.[14] We begin our analysis by setting forth the legal principles that govern our review of this claim. Choice of law questions are subject to de novo review. E.g., *American States Ins. Co.* v. *Allstate Ins. Co.*, 282 Conn. 454, 461, 922 A.2d 1043 (2007). When evaluating choice of law questions sounding in tort, this court applies the "most significant relationship" test set forth in the Restatement (Second). *Jaiguay* v. *Vasquez*, supra, 287 Conn. 349. As we previously have observed, the choice of law principles applicable to tort actions also apply to claims brought under CUTPA. See *Macomber* v. *Travelers Property & Casualty Corp.*, 277 Conn. 617, 640, 894 A.2d 240 (2006).

"Section 145 of the Restatement [(Second) of Conflict of Laws] provides in [relevant part] that '[t]he rights and liabilities of the parties with respect to an issue [in

tort] are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.' [1 Restatement (Second), supra, § 145 (1), p. 414.] Section 6 of the Restatement [Second], in turn, provides: '(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law. (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the [protection] of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.' [1 id., § 6, p. 10.]" *O'Connor* v. *O'Connor*, 201 Conn. 632, 650–51, 519 A.2d 13 (1986).

"For assistance in our evaluation of the policy choices set [forth] in §§ 145 (1) and 6 (2), we turn . . . to § 145 (2) of the Restatement [Second], which establishes black-letter rules of priority to facilitate the application of the principles of § 6 to tort cases. . . . Section 145 (2) provides: 'Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.' [1 Restatement (Second), supra, § 145 (2), p. 414.]" (Citation omitted.) *O'Connor* v. *O'Connor*, supra, 201 Conn. 652.

Applying § 145 (2) (a) of the Restatement (Second) to the present case, we agree with the Appellate Court that the plaintiff's injury occurred in New Mexico, the place where the plaintiff suffered the adverse consequences of its decision to purchase the new software. With respect to § 145 (2) (b), the Appellate Court concluded that the injury causing conduct occurred in New Mexico, "where the goods were installed, service was provided, and training occurred." *Western Dermatology Consultants P.C.* v. *VitalWorks, Inc.*, supra, 146 Conn. App. 207. We do not agree completely with the Appellate Court's conclusion. Our review of the pertinent facts reveals that the events that the Appellate Court relied on were the consequences of an earlier occurrence, namely, VitalWorks' decision to make a binding offer for sale of the new software to the plaintiff from its headquarters in Connecticut, which, in turn, was the result of VitalWorks' earlier demonstrations of the software to the plaintiff in California and New Mexico. We

thus are persuaded that the injury causing conduct in this case occurred in California, New Mexico, and Connecticut. With regard to § 145 (2) (c), we conclude that it is a neutral factor: the plaintiff is located in New Mexico, whereas VitalWorks was, at the time, headquartered in Connecticut, and Cerner is headquartered in Missouri. Finally, with respect to § 145 (2) (d), we agree with the Appellate Court that the relationship between the parties was centered in New Mexico, where the plaintiff "reviewed and signed the contract, beginning the [legal] relationship . . . [and where] [t]he goods and concomitant services contracted for were delivered, installed, and performed . . . ." Id., 208.

As we previously have explained, "it is the significance, and not the number, of § 145 (2) contacts that determines the outcome of the choice of law inquiry under the Restatement [Second] approach. As the concluding sentence of § 145 (2) provides, [t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." (Internal quotation marks omitted.) *Jaiguay* v. *Vasquez*, supra, 287 Conn. 353. Although the trial court found that "[t]he sales agreement was drafted in Connecticut by VitalWorks," and that "Connecticut was the state where the parties' relationship initiated," these factors alone do not outweigh the significant contacts to New Mexico. Consistent with the determination of the Appellate Court, therefore, we conclude that, on balance, "New Mexico had the greatest contact with the parties in this case." *Western Dermatology Consultants P.C.* v. *VitalWorks, Inc.*, supra, 146 Conn. App. 208.

Likewise, the factors enumerated in § 6 (2) of the Restatement (Second) also militate in favor of the applicability of New Mexico law to the plaintiff's unfair trade practices claim. Section 6 (2) (a), the needs of the interstate and international systems, supports neither state's law. With regard to § 6 (2) (b), the relevant policies of the forum, we conclude that, although Connecticut undoubtedly has an interest in applying its law to ensure that local businesses do not engage in unfair trade practices in this state, that interest is not especially strong in the present case in view of the limited nature of the contact that occurred between the parties in Connecticut.[15] New Mexico's interest in protecting its citizens and commercial enterprises from unfair or deceptive trade practices, however, is especially strong in the present case considering the facts that the plaintiff conducts its business exclusively in New Mexico and that the majority of the dealings between the parties took place in that state. Accordingly, we conclude that § 6 (2) (c), which requires consideration of the relevant policies of other interested states and the relative interests of those states, also supports application of New Mexico law.

Turning to § 6 (2) (d), the protection of justified

expectations, we agree with the Appellate Court that there was "no justified expectation that Connecticut law, including CUTPA, would apply to tort claims not arising from the construction and interpretation of the contract itself." Id., 210. As we explained, the Appellate Court reached its determination on the basis of the choice of law provision in the parties' contract, which designated Connecticut as the forum state but expressly limited the application of Connecticut law to "the construction and interpretation of the contract itself." Id. Thus, on the basis of the breadth and depth of the parties' contacts with New Mexico, we agree with the Appellate Court that it was much more reasonable for the parties to expect New Mexico law to govern any consumer protection related dispute arising out of their business relationship.

We also agree with the Appellate Court that § 6 (2) (e), the basic policies underlying the particular field of law, is a neutral factor because the unfair trade practice statutes of both New Mexico and Connecticut are intended to effectuate the same policies, namely, "[t]he deterrence of tortious conduct and the provision of compensation for the injured victim . . . ." Id., quoting 1 Restatement (Second), supra, § 145, comment (b), p. 416. The remaining factors, § 6 (2) (f) and (g), direct us to examine the certainty, predictability and uniformity of result, and the ease in the determination and application of the law to be applied, respectively. As we observed in *O'Connor*, these factors "should 'not be overemphasized' "; *O'Connor* v. *O'Connor*, supra, 201 Conn. 651–52; because the Restatement (Second) "cautions against attaching independent weight to these auxiliary factors, noting that they are ancillary to the goal of providing rational, fair choice of law rules." Id., 651. Once again, we agree with the Appellate Court that, to the extent they are relevant, the factors set forth in § 6 (2) (f) and (g) militate in favor of applying New Mexico law "because the vast majority of the plaintiff's contact with the defendants happened in New Mexico. It would, therefore, be predictable and uniform, as well as easy, to determine and apply" the law of that state. *Western Dermatology Consultants P.C.* v. *VitalWorks, Inc.*, supra, 146 Conn. App. 210. Accordingly, we conclude that the Appellate Court properly determined that New Mexico had the most significant relationship with the parties in the present case, thus requiring that the law of that state be applied to the plaintiff's unfair trade practices claim.

We note, finally, that, after reversing the trial court's judgment in favor of the plaintiff on its CUTPA claim, the Appellate Court remanded the case to the trial court with direction to render judgment for the defendants. Id., 214. As we explain hereinafter, however, the Appellate Court, having determined that the trial court incorrectly applied Connecticut law to the plaintiff's unfair trade practices claim; id., 211; should have remanded

the case for a new trial on that claim.

As we previously noted, the Appellate Court first determined that the plaintiff could not establish a violation of CUTPA; see id., 198–202; and only then did it address the choice of law issue. Id., 203–11. It is not clear from the Appellate Court's opinion why it reached the CUTPA claim even though the defendants maintained that there was an outcome determinative conflict between the laws of Connecticut and New Mexico. See id., 197 ("[t]he defendants also contend that an outcome determinative conflict of laws exists regarding whether the plaintiff could claim a CUTPA violation sounding in tort against VitalWorks and Cerner"). Logically, however, once the Appellate Court had been apprised of the multistate nature of the relationship between the parties and of the potential outcome determinative conflict between the laws of the various states involved, it should have addressed the broader question of which state's law governs the dispute before determining whether any law had been violated. See, e.g., *Gibson* v. *Fullin*, 172 Conn. 407, 411, 374 A.2d 1061 (1977) ("[w]hen the rights and liabilities of parties to an action result from an occurrence involving a significant relationship in another state, the court in which the action is pending must determine whether its own law or the law of the other state shall be applied"). Therefore, the Appellate Court should have resolved the choice of law issue first.

Having resolved that issue in favor of New Mexico law, we now must determine the proper remedy. Ordinarily, the trial court's failure to apply the correct legal standard results in a remand to the trial court for application of the correct standard. See, e.g., *McDermott* v. *State*, 316 Conn. 601, 611, 113 A.3d 419 (2015) ("[w]e have often stated that . . . a party is generally entitled to a new trial when, on appeal, a different legal standard is determined to be required, unless we conclude that, based on the evidence, a new trial would be pointless"); *Reichhold Chemicals, Inc.* v. *Hartford Accident & Indemnity Co.*, 243 Conn. 401, 423, 426, 703 A.2d 1132 (1997) (remanding case for new trial when trial court incorrectly applied New York rather than Washington law); *Deroy* v. *Estate of Baron*, 136 Conn. App. 123, 127, 43 A.3d 759 (2012) ("[w]hen an incorrect legal standard is applied, the appropriate remedy is to reverse the judgment of the trial court and to remand the matter for further proceedings"); see also *Leane* v. *Joseph Entertainment Group, Inc.*, 267 Ill. App. 3d 1036, 1043, 642 N.E.2d 852 (1994) (reversing and remanding case for new trial under Wisconsin law when trial court incorrectly applied Illinois law to parties' dispute); *Ohayon* v. *Safeco Ins. Co. of Illinois*, 91 Ohio St. 3d 474, 476, 482–83, 486, 747 N.E.2d 206 (2001) (upholding Ohio Appellate Court's remand for application of Ohio law to parties' dispute when trial court incorrectly applied Pennsylvania law); *Cudd Pressure Control, Inc.*

v. *Sonat Exploration Co.*, 202 S.W.3d 901, 903, 911–12 (Tex. App. 2006) (reversing judgment and remanding case to trial court to apply Louisiana law when trial court incorrectly applied Texas law), aff'd, 271 S.W.3d 228 (Tex. 2008). There is no reason to deviate from that general principle in the present case. The defendants did not challenge the application of Connecticut law to the plaintiff's unfair trade practices claim until after the trial had concluded, and the plaintiff tried its claim and prevailed in accordance with that unchallenged legal framework. The plaintiff was fully entitled to rely on that framework and had no reason to put forth an alternative theory of liability under New Mexico law.[16] See, e.g., *Lockett* v. *Flying U Rodeo Co.*, California Court of Appeal, Docket No. A102814 (Cal. App. September 22, 2004) ("[t]ypically, a forum state applies its own law to the determination of issues that are raised in an action filed in that state unless a party makes a timely invocation of a request that the law of another state should apply" [emphasis omitted]); cf. *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 318–20, 991 A.2d 666, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010). Accordingly, we conclude that the present case must be remanded for a new trial to allow the parties to present their cases under the governing law, namely, the law of New Mexico, and to allow the trial court to evaluate the facts of the case in light of that law.[17]

The judgment of the Appellate Court is reversed with respect to its disposition of the plaintiff's CUTPA claim and the case is remanded to that court with direction to remand the case to the trial court for a new trial on the plaintiff's unfair trade practices claim, which shall be governed by New Mexico law; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.

[1] VitalWorks is now known as Amicas, Inc. We nevertheless refer to it as VitalWorks, which was its name at all times relevant to the present case.

[2] General Statutes § 42-110b (a) provides in relevant part: "(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

The terms "trade" and "commerce," in turn, are defined in CUTPA as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4).

[3] The parties also raise several additional claims on appeal. In particular, the plaintiff argues that the Appellate Court incorrectly concluded that CUTPA was not implicated on the ground that the defendants had not engaged in any trade or commerce in Connecticut. The plaintiff also challenges the trial court's refusal to award punitive damages, full attorney's fees, prejudgment interest, and certain costs. Cerner argues that the Appellate Court's decision that the plaintiff cannot maintain a CUTPA claim against Cerner can be affirmed on the alternative ground that the trial court improperly imposed liability on Cerner as a successor to VitalWorks. In light of our resolution of the case, we need not address the parties' arguments with regard to CUTPA, Cerner's alternative ground for affirmance or the plaintiff's arguments with regard to punitive damages, attorney's fees, prejudgment interest, and certain costs.

[4] During that time, the plaintiff documented patient visits by having dictated notes transcribed at a cost of between $2000 and $2500 per month.

[5] In addition to making CUTPA-specific allegations in count six, the plain-

tiff also incorporated by reference the allegations in the other five counts.

[6] The trial court determined, however, that the plaintiff had not met the higher standard of proof applicable to the fraud count. The court also declined to award any damages on the unjust enrichment count, concluding that to allow for such damages in the present case "would . . . create a windfall profit for the plaintiff, rather than properly compensating [it] for the defendants' breach." Finally, although the trial court found that the defendants had breached the contract, it did not award the plaintiff any damages on that count. See *Western Dermatology Consultants*, *P.C.* v. *VitalWorks*, *Inc.*, 146 Conn. App. 169, 173–74, 214, 78 A.3d 167 (2013). With respect to the remaining counts, the the plaintiff was awarded $83,399.82 for the breach of warranty count, $5100 for the negligent misrepresentation count, and $157,441.58 for the CUTPA count. Id., 174.

[7] See e.g., *Titan Sports, Inc.* v. *Turner Broadcasting Systems, Inc.*, 981 F. Supp. 65, 71 (D. Conn. 1997) ("[a] CUTPA violation . . . need not necessarily occur in Connecticut, but instead, the violation must be tied to a form of trade or commerce intimately associated with Connecticut" [emphasis omitted; internal quotation marks omitted]).

[8] The trial court denied the plaintiff's request for punitive damages and prejudgment interest. See *Western Dermatology Consultants*, *P.C.* v. *VitalWorks*, *Inc.*, 146 Conn. App. 169, 174, 78 A.3d 167 (2013). The court did, however, award the plaintiff $496,051.95 in attorney's fees and $47,340.16 in costs. Id., 174–75.

[9] In conducting the choice of law analysis in the present case, both the trial court and the Appellate Court, citing *O'Connor* v. *O'Connor*, 201 Conn. 632, 519 A.2d 13 (1986), first applied the doctrine of lex loci delicti—the place of injury—before proceeding to the most significant relationship test set forth in §§ 6 (2) and 145 of the Restatement (Second) of Conflict of Laws. See *Western Dermatology Consultants*, *P.C.* v. *VitalWorks*, *Inc.*, supra, 146 Conn. 203–206. As we stated in *Jaiguay*, however, "we have moved away from the place of the injury rule for tort actions and adopted the most significant relationship test found in §§ 6 and 145 of the Restatement (Second) of Conflict of Laws." *Jaiguay* v. *Vasquez*, supra, 287 Conn. 349. To the extent that there may be some lingering confusion as to whether we have completely abandoned the lex loci test in tort actions, we take this opportunity to reiterate that the most significant relationship test outlined in §§ 6 (2) and 145 of the Restatement (Second) of Conflict of Laws is the proper test to apply in tort actions to determine which state's law applies.

[10] In its appeal to the Appellate Court, the plaintiff claimed that the trial court "abused its discretion in denying the [plaintiff's request for] punitive damages, reducing the amount of attorney's fees and refusing to award it certain costs," and that the trial "court erred in declining to award it prejudgment interest." *Western Dermatology Consultants*, *P.C.* v. *VitalWorks*, *Inc.*, supra, 146 Conn. App. 176. The Appellate Court concluded that the plaintiff was not entitled to punitive damages, attorney's fees or costs, which were recoverable only under CUTPA, as the plaintiff could not prevail on that claim. Id., 213. The court also concluded that the plaintiff was not entitled to prejudgment interest because it was "foreclosed from recovering under the contract, either for breach of contract or warranty, such that there could not be money due to the plaintiff that would have been subject to prejudgment interest . . . ." Id., 214.

In addition, Cerner contended that the trial court improperly imposed successor liability on it. Id., 212. In light of its conclusion that CUTPA was not applicable to the present dispute, the Appellate Court did not address the issue of successor liability. See id., 212–13.

[11] The Appellate Court also directed the trial court to render judgment for the defendants on the other counts, namely, breach of contract, breach of warranty, and negligent misrepresentation. See *Western Dermatology Consultants*, *P.C.* v. *VitalWorks*, *Inc.*, supra, 146 Conn. App. 214. The plaintiff has not challenged the Appellate Court's judgment as to these counts.

[12] In light of our remand for a new trial, we need not address the third certified question regarding the denial of prejudgment interest, punitive damages and certain costs. See footnote 3 of this opinion.

[13] In support of their argument to the contrary, the defendants rely on *Gomes* v. C*ommercial Union Ins. Co.*, 258 Conn. 603, 783 A.2d 462 (2001). *Gomes*, however, is inapposite to the present case. In *Gomes*, the plaintiffs' gas station suffered fire damage following a burglary. Id., 606. Several guests at an adjacent hotel alerted the hotel clerk about the break-in and the subsequent fire, and the clerk promised to take care of the situation but failed to take any action. Id. As a result, both the gas station and the hotel

were damaged by fire and smoke. Id. The hotel's losses were covered by its insurance carrier, which, in turn, sought reimbursement from the plaintiffs in a standard subrogation letter. See id. The plaintiffs brought an action against the hotel and the insurance carrier, claiming, among other things, that (1) the hotel clerk had intentionally or negligently prevented a hotel guest from rendering aid to the plaintiffs, and (2) the act of sending the letter, *coupled with the knowledge of the hotel clerk's intentional or negligent acts*, constituted a violation of CUTPA. Id., 604–605, 620. The trial court granted summary judgment, and we affirmed, concluding that, because the hotel clerk's conduct was not actionable under either an intentional tort or negligence theory, the plaintiffs' CUTPA claim also failed because "the factual predicate of the claimed unfair or deceptive act or practice . . . [did] not exist." Id., 620. Thus, contrary to the defendants' contention, our holding in *Gomes* does not stand for the proposition that a plaintiff cannot prevail on a CUTPA claim if it also failed to prevail on the underlying claims. Instead, *Gomes* holds that a CUTPA claim cannot be sustained when it is partially predicated on separate wrongful conduct, and when that conduct has been deemed not to be wrongful as a matter of law. In the present case, such a determination could not have been made because, unlike the plaintiffs in *Gomes*, the plaintiff in the present case did not allege that the claims of breach of contract, breach of warranty, unjust enrichment, negligent misrepresentation or fraud, alone or in conjunction with some other acts, also constituted a violation of CUTPA. Rather, the plaintiff alleged that certain of the defendant's acts, taken in the course of the parties' business relationship, *independently* constituted a breach of contract, breach of warranty, negligent misrepresentation, unjust enrichment, fraud, and an unfair trade practice.

[14] We note that the plaintiff contends that the defendants waived their right to argue that New Mexico law governs the plaintiff's unfair trade practices claim by failing to raise that claim in a proper manner in the trial court. Specifically, the plaintiff argues that the trial court was not required to apply New Mexico law to its unfair trade practices claim because the defendants never argued at trial that New Mexico's unfair trade practices law conflicts with CUTPA, and, in Connecticut, the party seeking a choice of law determination bears the burden of demonstrating such a conflict. See, e.g., *Walzer* v. *Walzer*, 173 Conn. 62, 76, 376 A.2d 414 (1977) ("[w]hen the applicable law of a foreign state is not shown to be otherwise, we presume it to be the same as our own"); *Cohen* v. *Roll-A-Cover, LLC*, 131 Conn. App. 443, 465–66, 27 A.3d 1 ("The threshold choice of law issue in Connecticut, as it is elsewhere, is whether there is an outcome determinative conflict between applicable laws of the states with a potential interest in the case. If not, there is no need to perform a choice of law analysis, and the law common to the jurisdiction should be applied." [Internal quotation marks omitted.]), cert. denied, 303 Conn. 915, 33 A.3d 739 (2011). The plaintiff also argues that the defendants, by failing to raise the choice of law issue prior to trial, and instead waiting to do so until after trial, are estopped from raising the issue on appeal. The plaintiff, however, never argued in the Appellate Court that that court should decline to review the defendants' choice of law claim on the basis of the defendants' failure to raise it in a timely and otherwise proper manner in the trial court. As we recently explained, "[i]t would undermine the interests of judicial economy, the orderly administration of justice and principles of fairness to allow a party to stand silent when the opposing party raises an unpreserved claim in the Appellate Court and then, after the unpreserved claim has been resolved in favor of the party that raised it, to allow the party that stood silent to object to review of the claim for the first time on appeal to this court." *Mueller* v. *Tepler*, 312 Conn. 631, 644, 95 A.3d 1011 (2014). Consistent with this principle, we decline to consider the plaintiff's claim that the defendants waived their choice of law claim.

We do note, however, that there is, in fact, an outcome determinative conflict of laws between the unfair trade practices law of New Mexico and CUTPA. Specifically, N.M. Stat Ann. § 57-12-1 et seq. (2000 & Supp. 2015), unlike CUTPA, requires a showing that the alleged false or misleading representation was "knowingly made . . . ." N.M. Stat. Ann. § 57-12-2 (D) (Supp. 2015); see, e.g., *Stevenson* v. *Louis Dreyfus Corp.*, 112 N.M. 97, 100–101, 811 P.2d 1308 (1991) ("[t]he knowingly made requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading" [internal quotation marks omitted]); cf. *Web Press Services Corp.* v. *New London Motors, Inc.*, 203 Conn. 342, 363,

525 A.2d 57 (1987) (knowledge of falsity, constructive or actual, need not be proven under CUTPA).

We note, moreover, that the defendants did not identify the New Mexico statute's scienter requirement as the outcome determinative conflict when it asked the trial court to apply New Mexico law. The defendants argued, rather, that the New Mexico statute of limitations barred the plaintiff's claim. In fact, the statute of limitations for actions brought under the New Mexico Unfair Practices Act is four years, one year longer than CUTPA's limitation period. Compare *Nance* v. *L.J. Dolloff Associates*, *Inc.*, 138 N.M. 851, 856, 126 P.3d 1215 (App. 2005) (claim that is founded on violation of statute, such as New Mexico Unfair Practices Act, that does not specify limitation period is subject to four year statute of limitations), with General Statutes § 42-110g (f) (specifying three year limitation period).

[15] We express no opinion as to whether the defendants were engaged in trade or commerce in this state for purposes of CUTPA.

[16] As we have explained, it is only because the plaintiff did not challenge the propriety of the defendants' choice of law claim in the Appellate Court that we are obliged to review that claim in the present appeal. See footnote 14 of this opinion. Generally, however, choice of law claims must be raised in the trial court in a timely manner; otherwise, they are deemed to be waived. E.g., *Harty* v. *Cantor Fitzgerald & Co.*, 275 Conn. 72, 90, 881 A.2d 139 (2005) ("[w]e agree with the plaintiff that [the] issue must be determined under Connecticut law because, at trial, the defendant failed to raise the New York choice of law provision as applied to [the statute at issue] and because the trial court rendered its decision solely by reference to Connecticut law"); id., 90 n.9 (noting that defendants, having relied on Connecticut law in their briefs in trial court, cannot later complain that trial court should have applied another state's law).

[17] We note that none of the parties has specifically requested a new trial in the event that this court concluded that the trial court should have applied New Mexico law to the plaintiff's unfair trade practices claim. If the trial court had decided the choice of law issue correctly, however, that court would have been required to apply New Mexico law to the plaintiff's claim. In such circumstances, the defendants, having asked the trial court to apply New Mexico law to the plaintiff's unfair trade practices claim—presumably because they believed that that state's statute of limitations favored them— have no cause to complain about a remand so that New Mexico law can be applied. Such a remedy simply places them in the position that they would have been in if the trial court had decided the choice of law issue correctly, in accordance with the defendants' request.

---